# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PARAGON ENGINEERING SERVICES, INC.,** | : | **CIVIL ACTION 1:24-CV-312** |
| | : | |
| | : | **(Judge Conner)** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PROVIDENCE ENGINEERING CORPORATION,** *et al.,* | : | |
| | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

This action arises out of a trade secret and copyright dispute between plaintiff Paragon Engineering Services, Inc., and its former president and founder, defendant Vaughn G. Silar, and individuals and entities associated with him. Presently pending before the court is Paragon's motion for preliminary injunction. Following an evidentiary hearing on the matter, we will deny the motion.

## I.    Background

Paragon originally sued Mr. Silar in 2022 in the Court of Common Pleas of York County for violating restrictive covenants contained within the settlement agreement Mr. Silar entered when he left Paragon.  (See Doc. 19 ¶¶ 38-40, 156); see also Paragon Engineering Services, Inc. v. Vaughn G. Silar, No. 2022-SU-3045 (Pa. Ct. Comm. Pl. 2022).  On January 30, 2024, Paragon and Mr. Silar agreed to a stipulated order for preliminary injunctive relief in that case enjoining Mr. Silar from, *inter alia*, (1) performing professional engineering services for certain Paragon clients, and (2) using Paragon's confidential engineering work products.

(See Doc. 44-1).  Paragon claims that discovery in that case revealed additional wrongdoing by Mr. Silar and others associated with him, forming the basis for this federal lawsuit.  (See Doc. 44 at 4).

Paragon filed its complaint in this matter on February 21, 2024, which it amended on April 22, 2024.  (See Docs. 1, 19).  The amended complaint raises twelve claims under state and federal law against nine defendants: Mr. Silar; his wife, Kimberly Silar; the Silars' project management companies, Bluewater Project Management, LLC, and Bluewater Engineering (collectively, "the Silar Defendants"); Paragon's client and competitor, Providence Engineering Corporation; and Providence's agents, Rebecca Thompson (Providence Vice President and former Paragon employee), David Bernhardt (Providence President and CEO), Tina Bernhardt (former Providence Project Engineer), and Leslie Friedman (Providence Designer and former Paragon employee) (collectively, "the Providence Defendants").  (See Doc. 19).

Paragon generally alleges that the defendants improperly used its client list and confidential information when providing engineering services to third parties on engineering projects.  (See id.)  Specifically, it asserts claims for: misappropriation of trade secrets against all defendants (Counts I and II); false designation of origin against all defendants except Bluewater Engineering and Ms. Thompson (Count III); passing off against Providence, Mr. and Mrs. Silar, Mr. and Mrs. Bernhardt, and Ms. Friedman (Count IV); copyright infringement against all defendants except Bluewater Engineering and Ms. Thompson (Count V); tortious interference with contract against all defendants (Count VI); breach of

contract against Ms. Thompson, Ms. Friedman, and Mr. Silar (Counts VII, VIII, and X); civil conspiracy against all defendants (Count IX); unjust enrichment against Mr. Silar (Count XI); and conversion against Mr. Silar (Count XII).  (See id.)

On June 26, 2024, Paragon filed a motion for preliminary injunction.  (See Doc. 32).  Paragon's supporting brief clarifies that it seeks an injunction on Counts I, II, III, and V only, "to ensure that its customer list and technical drawings are protected from all Defendants."  (See Doc. 44 at 4, 7-8).  It asks the court to issue a preliminary and permanent injunction, ordering that:

A.  Defendants and their agents and employees are enjoined from disclosing or publishing any Paragon client or customer list, including Exhibit I of the Settlement Agreement, in any format;

B.  Defendants and their agents and employees are enjoined from disclosing, using, or publishing any of Paragon's engineering work product, including instruments of service, technical drawings, plans, sketches, and specifications, and are enjoined from creating any derivative works therefrom (such work product and derivative works referred to herein as "Unauthorized Materials").  To the extent that a Project is active or currently underway whether in design or construction the licensing and use of the proprietary engineering work, including instruments of service, technical drawings, plans, sketches, and specifications shall be controlled by the written agreement between Plaintiff Paragon and Defendant Providence. Accordingly, Unauthorized Materials does not include instruments of service, technical drawings, plans, sketches, and specifications for active or currently underway Projects. Nothing in this Injunction shall grant Providence any additional ownership rights, license or authority to use Paragon's proprietary engineering work product, instruments of service, technical drawings, plans, sketches, and specifications;

C.  Defendants and their agents and employees are ordered to destroy and deliver up for destruction any Paragon client or customer list and all Unauthorized Materials currently in Defendants' possession, custody, or control; and

3

D.    This Injunction shall remain in effect until resolution of the underlying litigation.

(See Doc. 44 at 33-34).  The court held an evidentiary hearing on the motion on

October 11, 2024, and the parties have filed proposed findings of fact and

conclusions of law.  The motion is fully briefed and ripe for disposition.

## II.    **Findings of Fact**[1]

Paragon is a design engineering firm that provides professional engineering

services in "the mechanical, electrical, plumbing ("MEP"), and fire protection

disciplines throughout the United States."  (See Doc. 61 ¶ 1; Doc. 60 ¶ 1).  Mr. Silar,

a licensed professional engineer with over thirty years' experience, founded

Paragon in 2002.  (See Doc. 61 ¶ 2).  He served as the firm's sole owner until the end

of 2017.  (See id. ¶¶ 2, 12).

Relevant to the instant lawsuit, Paragon previously worked on

telecommunications projects for cellular companies such as AT&T and Verizon.

(See 10/11/24 Hr'g Tr. 16:20-20:20).  Paragon's role on these matters involved

designing the electrical and radio frequency aspects of the projects only.  (See id.

at 19:4-20:20).  As a result, Paragon never contracted directly with cellular

companies and instead served as a subcontractor to another engineering firm.  (See

id.)  Mr. Silar and his wife also formed Bluewater Project Management, LLC, to

serve as a general project manager and to facilitate work streams for Paragon.  (See

---

[1] Consistent with the directive of Federal Rule of Civil Procedure 65(d), the following factual narrative represents the court's findings of fact as derived from the evidence submitted during the preliminary injunction hearing and the parties' proposed findings of fact.  (See Doc. 59, 10/11/24 Hr'g Tr.; Docs. 60, 61).

Doc. 60 ¶ 8; Doc. 61 ¶¶ 45, 46; 10/11/24 Hr'g Tr. 45:16-23).  A key purpose of Bluewater was to bring Paragon work from High Performance Services, LLC ("HPS"), a wireless telecommunication project management and site acquisition firm that contracted with AT&T to perform cell tower construction and design. (See Doc. 60 ¶¶ 7, 20; Doc. 61 ¶¶ 48, 49).

Paragon's scope of work on telecommunications projects involved designing and delivering construction documents in the form of two-dimensional computer-aided design ("CAD") files.  (See 10/11/24 Hr'g Tr. 20:24-22:6).  These files included "instruments of service, technical drawings, plans, sketches, specifications, and derivative works created therefrom."  (See Doc. 61 ¶ 13).  Paragon placed an ownership disclosure on each set of documents that it distributed: "This drawing is and shall remain the property of the engineer and reuse on project extension, any other project, or alterations or additions to this project shall be at user's sole risk and without liability to the engineer."  (See 10/11/24 Hr'g Tr. 22:2-32:1 (referencing P. Ex. 21 at 95)).  While Mr. Silar generally required Paragon to execute a written contract before providing engineering services to others, (see Doc. 61 ¶¶ 14-17), Paragon never completed such a contract with Bluewater, HPS, or AT&T.  (See id. ¶¶ 47, 48, 51, 52; 10/11/24 Hr'g Tr. 150:2-7 (Mr. Silar: "I owned both [Bluewater and Paragon], and I just did the work.")).  Instead, assignments for AT&T projects flowed to Paragon through Bluewater based on AT&T's written agreement with HPS, and an oral agreement between HPS and Bluewater.  (See Doc. 61 ¶ 48). Paragon's work on AT&T projects continued in this manner until Mr. Silar's departure from Paragon.  (See id. ¶¶ 43-53; Doc. 60 ¶¶ 8, 9).

In September 2019, Mr. Silar sold all his shares in Paragon and executed a settlement agreement with Paragon's new owners, Peter Beddia, Rodger Lease, and James Sanford.  (See Doc. 61 ¶ 19).  The settlement agreement included a non-compete agreement.  (See Silar Def. Ex. B at 20).  One of the key aspects of this agreement, which the parties negotiated extensively, was that it allowed Mr. Silar to continue working with telecommunications clients.  (See Doc. 60 ¶¶ 9-12; Silar Def. Ex. B at 1-2; 10/11/24 Hr'g Tr. 52:13-53:2).  Paragon agreed to this carveout in exchange for reducing Mr. Silar's payout by $200,000 and removing some of his company benefits.  (See Doc. 60 ¶ 11; Silar Def. Ex. B. at 2; 10/11/24 Hr'g Tr. 164:25-165:6).  Accordingly, the preamble to the settlement agreement stated:

> Beddia and Lease proposed to remove the telecom clients listed in the Paragon client list in the 9000 client numbers[2] as well as any other telecom work . . . from the parameters of the non-competition and non-solicitation in exchange for reducing the purchase price for all of Silar's outstanding shares.

(See Silar Def. Ex. B at 2).  The definitions section of the non-compete agreement defined "confidential and proprietary information" by excluding any information obtained by Paragon from "telecommunications companies and the 9000 Companies."  (See id. at 20).  The definition of the term "Clients and Customers" further clarified that neither Bluewater nor "any telecommunications company or any of the companies in the 9000s . . . [shall] be considered a Client or Customer."

---

[2] Paragon provides a four-digit numerical designation for each of its clients. (See Silar Def. Ex. B. at 27-49 (Paragon's Client List)).

(<u>See</u> <u>id.</u> at 21).  The substantive section of the non-compete agreement likewise explained:

> [T]here shall be no restrictions whatsoever on the performance of work by Silar of any kind, including but not limited to mechanical, electrical, plumbing or fire protection engineering services, for telecommunications companies or the 9000 Companies, whether the work is performed by Silar himself, an entity controlled by Silar, Silar on behalf of or for a Client or Customer or otherwise.

(<u>See</u> <u>id.</u> at 23).

Notwithstanding the foregoing, the non-compete agreement was not toothless.  Mr. Silar agreed not to otherwise use or disclose Paragon's "confidential and proprietary information."  (<u>See</u> <u>id.</u> at 21).  The parties agreed that this referred to Paragon's "customers" and "products."  (<u>See</u> <u>id.</u> at 20).  For clarity, Paragon attached its complete client list to the agreement.  (<u>See</u> <u>id.</u> at 27-49).  Mr. Beddia testified that the carveout allowing Mr. Silar to compete in the telecommunications space did not allow him to take any of Paragon's files or materials.  (<u>See</u> 10/11/24 Hr'g Tr. 53:3-21 ("It's all property of Paragon Engineering.  He was entitled to nothing.")).  Nonetheless, when Mr. Silar left Paragon, he attempted to take every piece of Paragon's confidential and proprietary information that he could get his hands on: "I tried to get all of it."  (<u>See</u> <u>id.</u> at 155:6-156:15).  He downloaded these documents to his personal computer and storage devices.  (<u>See</u> <u>id.</u>; <u>see also</u> <u>id.</u> at 177:1-17).  At no point in time did he seek permission from Paragon to take the information or inform its new leadership that he was doing so.  (<u>See</u> Doc. 61 ¶ 27).

After leaving Paragon, Mr. Silar and his wife continued operating Bluewater to manage projects for telecommunications clients, including AT&T.  (<u>See</u> Doc. 60

¶¶ 20, 21).  Mr. Silar planned to refer some of this work to Paragon, but the

company's new leadership insisted that the parties first memorialize an agreement.

(See id. ¶¶ 23-29; Doc. 61 ¶¶ 53-55).  These negotiations revealed a disconnect.  (See

Doc. 61 ¶ 54).  Paragon demanded that it retain ownership rights over the

engineering materials it would provide Bluewater for telecommunications projects

involving HPS and AT&T.  (See Doc. 61 ¶ 54; Doc. 60 ¶ 24).  It also offered to sell

AT&T a non-exclusive license.  (See Doc. 60 ¶ 26).  Mr. Silar informed Paragon that

this was unacceptable.  (See id. ¶¶ 25-27).  He explained that the HPS-AT&T

contract required AT&T to own the work product:

> AT&T shall be the exclusive owner of all right, title, and interest in and
> to all Paid-For Development, including, without limitation, all
> Intellectual Property Rights therein and thereto.  Supplier shall assign
> or have assigned to AT&T and hereby assigns to AT&T all Intellectual
> Property Rights in and to the Paid-For Development. . . .

(See id. ¶ 27).  In response, Paragon initially expressed a willingness to sell AT&T

the ownership rights.  (See id. ¶ 28; accord Doc. 52-7 at 1).  But the parties never

finalized such an agreement and all work between Paragon and Bluewater ceased

in early 2020.  (See Doc. 60 ¶ 29; Doc. 61 ¶ 55).

Mr. Silar continued his relationship with HPS sans Paragon.  (See Doc. 61

¶ 57).  In February 2020, HPS sought technical drawings from Mr. Silar that

Paragon had provided to Bluewater during Mr. Silar's tenure there.  (See id.)  This

included CAD files for a telecommunications project entitled Rainbow City.  (See

id.)  Mr. Silar first instructed HPS to ask Paragon for the files.  (See id. ¶ 58).  But

Paragon told HPS it was not a client and refused to provide them.  (See id. ¶ 59).

Mr. Silar then searched his personal inventory for the Rainbow City files.  (See id.

¶¶ 59-62).  When he found them, he emailed his colleagues and asked, "Can we "RECREATE" these with all the same INFO . . . ?"  (See P. Ex. 26 at 1; see also P. Ex. 27 at 2 ("Need cad files that are 'close'.")).  Codefendant Ms. Friedman subsequently provided Mr. Silar with the modified files, and he forwarded them to HPS.  (See P. Ex. 27 at 1; Doc. 61 ¶¶ 61-62).

Also in 2020, Mr. Silar distributed Paragon's confidential engineering materials to codefendant Providence without Paragon's knowledge or consent.  (See Doc. 61 ¶ 64).  These materials included Paragon's technical drawings for telecommunications projects entitled Lawrenceburg and Choctaw Bluff.  (See id. ¶¶ 64, 65).  Each time Mr. Silar redistributed Paragon's materials, he and his codefendants partially or fully removed references to Paragon from the documents.  (See id. ¶ 67; P. Exs. 21, 23, 26, 28, 29).  But these specific actions occurred in 2020, and Mr. Silar and Ms. Friedman testified that Bluewater and Providence have not engaged in telecommunications work for many years.  (See 10/11/24 Hr'g Tr. 163:17-24, 186:3-8; Doc. 60 ¶¶ 58, 64).  Mr. Beddia also confirmed that Paragon is no longer involved in projects for telecommunications clients.  (See 10/11/24 Hr'g Tr. 94:7-16; 129:4-7; Doc. 60 ¶ 53).

Mr. Silar's historical conduct *vis-à-vis* Paragon's client list is similarly dubious.  Paragon attached its complete client list to the settlement agreement with Mr. Silar to ensure he abided by terms of the non-compete.  (See Silar Def. Ex. B at 20-21).  It is indisputable that Paragon intended that the client list remain secret.  (See id.)  Yet Mr. Silar carelessly shared the list with third parties.  (See 10/11/24 Hr'g Tr. 174:23-175:15).  He repeatedly emailed the entire non-compete agreement,

9

including the client list, to prospective clients in a purported effort to outsource his conflict checking.  (See id.)  Moreover, in September 2021, he attached Paragon's client list to an email sent to codefendant Ms. Thompson at Providence with the title: "Have fun with this . . . ."  (See P. Ex. 53 at 1).  She forwarded the email to codefendant and Providence CEO Mr. Bernhardt.  (See id.)

Paragon purportedly first learned of the defendants' wrongdoing as to each of its claims during discovery in the York County case.  (See Doc. 44 at 4).  Paragon filed its complaint in this matter on February 21, 2024, and an amended complaint two months later.  (See Docs. 1, 19).  On June 26, 2024, another two months later, it filed a motion for preliminary injunction.  (See Doc. 32).  The court promptly set up a telephonic conference with the parties to schedule a hearing.  (See Doc. 33).  During the conference, Paragon agreed that an immediate hearing was not necessary, and the court set briefing deadlines and scheduled a hearing for three months later.  (See Doc. 35).  Throughout this time, Providence offered to return or destroy Paragon's client list to minimize any purported harm to Paragon.  (See Doc. 60 ¶¶ 52-53; Doc. 51-1 at 3-4).  Paragon did not respond to Providence's overture until the day of the hearing—over four months later.  (See id.)

III.  **Legal Standard**

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v. Natural Resources Defense Council, 555 U.S. 7, 24 (2008).  We apply a familiar four-factor test in determining the propriety of preliminary injunctive relief.  The movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm.  See

<u>Reilly v. City of Harrisburg</u>, 858 F.3d 173, 179 (3d Cir. 2017).  Under the first factor, the movant must show that "it can win on the merits."  <u>Id.</u>  This showing must be "significantly better than negligible but not necessarily more likely than not."  <u>Id.</u> (citations omitted).  The second factor carries a slightly enhanced burden: the movant must establish that it will "more likely than not" suffer irreparable harm absent the requested relief.  <u>Id.</u>  Only if these "gateway factors" are satisfied may the court consider the third and fourth factors: the potential for harm to others if relief is granted, and whether the public interest favors injunctive relief.  <u>See id.</u> at 176, 179.  The court must then balance all four factors to determine, in its discretion, whether the circumstances favor injunctive relief.  <u>See id.</u> at 179.

## IV.    <u>Discussion</u>

Paragon contends that injunctive relief is warranted on Counts I, II, III, and V.  (<u>See</u> Doc. 44 at 7-8).  The Providence Defendants argue that an injunction is inappropriate because (1) Paragon's allegations are largely against Mr. Silar—not them, (2) the materials at issue do not constitute trade secrets, and (3) even if they do, the carveout in Mr. Silar's non-compete agreement allows him to continue using such information.  (<u>See</u> Doc. 47 at 9-11).  The Providence Defendants and Paragon separately stipulated that they each retain ownership rights over engineering materials exchanged amongst themselves pursuant to other contracts.  (<u>See</u> Doc. 56 at 2-3).  In the stipulation, Providence acknowledges that it has received some Paragon materials from the Silar Defendants, and it disclaims ownership rights over those materials.  (<u>See id.</u> at 3).  The Silar Defendants argue that Paragon's claims are meritless because Paragon no longer owns the materials at issue and,

alternatively, that Mr. Silar negotiated for an explicit carveout in his settlement agreement to allow him to continue using those materials for telecommunications clients. (See Doc. 48 at 1-7). They further argue that Paragon's delay in filing warrants denial of injunctive relief and that Paragon has not shown any risk of immediate or irreparable harm. (See id. at 10-28).

### A.    Likelihood of Success on the Merits

Paragon has demonstrated a reasonable probability of success on the merits. To satisfy this factor, a plaintiff must demonstrate that it has a likelihood of success on at least one of its claims. See Cunningham Lindsey U.S., Inc. v. Bonnani, No. 1:13-CV-2528, 2013 WL 6080189, at *4 (M.D. Pa. Nov. 19, 2013) (Conner, C.J.) (citation omitted). This "requires a showing significantly better than negligible but not necessarily more likely than not." See Reilly, 858 F.3d at 179 (citations omitted). Paragon has shown that it has a reasonable chance of prevailing on Counts I, II, III, and V.

### 1.    Copyright Infringement

Paragon asserts that the defendants used its copyrights without authorization. (See Doc. 61 ¶¶ 8-14). A claim for copyright infringement requires a plaintiff to show (1) ownership of a valid copyright, and (2) a defendant's unauthorized use of original elements of the copyright. See Kay Berry, Inc. v. Taylor Gifts, Inc., 421 F.3d 199, 203 (3d Cir. 2005) (citation omitted). The Copyright Act provides that ownership of a copyright initially vests in the author of the work and may be transferred to another only in "writing and signed by the owner of the rights conveyed." See 17 U.S.C. §§ 201(a) & 204(a). A defendant may

defeat a copyright infringement claim by establishing that the plaintiff granted the defendant a nonexclusive license. See MacLean Assocs., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc., 952 F.2d 769, 778-79 (3d Cir. 1991) (citations omitted). Nonexclusive licenses may be granted orally or may be implied by conduct. See id. at 779 (citation omitted). An implied nonexclusive license exists if: "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the license-requestor copy and distribute his work." See Nat'l Ass'n For Stock Car Auto Racing, Inc. v. Scharle, 184 F. App'x 270, 275 (3d Cir. 2006) (nonprecedential) (citations omitted). When a nonexclusive license exists, a licensor may still succeed on a copyright infringement claim "if the licensee's use goes beyond the scope of the nonexclusive license." See MacLean Assocs., 952 F.2d at 779 (citation omitted).

Paragon has shown a reasonable probability of success on its copyright infringement claim. The parties do not dispute that Paragon is the original author of the technical drawings for the Choctaw Bluff, Lawrenceburg, and Rainbow City projects. (See P. Exs. 10, 12, 14). Paragon conspicuously included a note of ownership on each drawing. (See id.) It also successfully obtained copyright certifications for them. (See P. Exs. 9, 11, 13). Mr. Silar conceded that Paragon never signed a written agreement to transfer ownership for any of the drawings as required by the Copyright Act. (See 10/11/24 Hr'g Tr. 157:15-20). Although he testified that he had intended to transfer ownership of each drawing to AT&T while serving as Paragon's president, this self-serving testimony was not corroborated by

any other witness or documentary evidence.  (See id. at 168:22-172:4).  In fact, ownership disclosures on each drawing for AT&T state: "This drawing is and shall remain the property of the engineer . . . ."  (See, e.g., P. Ex. 21 at 95).  When confronted with these statements, Mr. Silar changed his testimony by explaining that Paragon retained ownership over the original drawings, but AT&T could reuse them as it saw fit.  (See 10/11/24 Hr'g Tr. 178:23-179:19).

Paragon also has shown that the defendants used its drawings without authorization.  Mr. Silar took everything he could from Paragon when he left, including its copyrighted materials.  (See Doc. 61 ¶ 26).  When Paragon refused to share certain materials with HPS and Providence, the defendants distributed them anyway.  (See id. ¶¶ 59-62; P. Ex. 26 at 1; P. Ex. 27 at 2).  Based upon the present record, this evidence may be reasonably construed as establishing unauthorized use.  Furthermore, the evidence does not suggest that Paragon granted a nonexclusive license to Bluewater, HPS, or AT&T.  No entity paid Paragon for a license.  (See Doc. 60 ¶ 26).  Mr. Silar steadfastly refused Paragon's offer to grant a nonexclusive license to AT&T, explaining that "AT&T requires exclusive ownership, not a license."  (See id. ¶¶ 26, 27).  Based on these facts, Paragon has established a likelihood of success on its copyright infringement claim.

### 2.    *False Designation of Origin Under the Lanham Act*

Paragon claims that the defendants falsely designated its engineering work product as their own.  (See Doc. 61 ¶ 18).  The Lanham Act "generally creates a federal cause of action for unfair competition."   See Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1428 (3d Cir. 1994) (citations omitted); see

also 15 U.S.C. § 1125(a).  A plaintiff bringing a claim for false designation of origin under the Act must establish (1) the defendants used "a false designation of origin"; (2) the "use of a false designation occur[ed] in interstate commerce in connection with goods and services"; (3) the "false designation is likely to cause confusion, mistake or deception as to the origin, sponsorship, or approval of [defendants'] goods or services"; and (4) the plaintiff has been or likely will be harmed.  See Am. Tel. & Tel. Co., 42 F.3d at 1428 (citation omitted).  A false designation of origin claim takes one of two forms: a "passing off" claim or a "reverse passing off" claim.  See Advanced Fluid Sys., Inc. v. Huber, 28 F. Supp. 3d 306, 335 (M.D. Pa. 2014) (Conner, C.J.).  A passing off claim alleges that the defendant "misrepresent[ed] his own goods or services as someone else's."  See id. (quoting Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 28 n.1 (2003)).  A reverse passing off claim asserts that the defendant "misrepresent[ed] someone else's goods or services as his own."  See id. (quoting Dastar Corp., 539 U.S. at 28 n.1).  Here, Paragon claims that the defendants engaged in both.  (See Doc. 61 ¶ 18).

The evidence demonstrates that Paragon has a reasonable chance of prevailing on this claim.  Paragon submitted documents showing that the defendants largely duplicated its technical drawings, removed Paragon's name, and reused them on new projects.  (See 10/11/24 Hr'g Tr. 70:9-84:14).  This included drawings for the Lawrenceburg project in Tennessee and the Choctaw Bluff project in Alabama.  (Compare P. Ex. 21 at 95, with P. Ex. 23 at 2; compare P. Ex. 28, with P. Ex. 29)).  In the main, the defendants removed Paragon's logo and changed the date on the documents, but on several documents Paragon remains listed as an

engineer. (See P. Ex. 23 at 2). Mr. Beddia testified that Paragon was not aware that anyone was reusing these documents and confirmed that Paragon was not involved in redoing this project. (See 10/11/24 Hr'g Tr. 74:21-75:9). Mr. Beddia further explained the striking similarities between Paragon's original drawings and the defendants' new versions for both the Choctaw Bluff and Lawrenceburg projects. (See id. at 75:10-84:14). He noted that the revision histories in the documents listed Ms. Friedman for the same dates, and that the unique technical specifications on the electrical drawings were identical. (See id.) He further explained that each engineering firm uses personalized drawing notes, and that the drawing notes on the recreated Lawrenceburg project materials copied Paragon's materials verbatim. (See id. at 83:70-84:14; compare P. Ex. 28 at 5, with P. Ex. 29 at 6)). Overall, Paragon has a realistic chance of proving that the defendants falsely designated its materials, thereby causing a strong likelihood of confusion or mistake as to the actual origin of the technical drawings.

### 3.    *Misappropriation of Trade Secrets*

Lastly, Paragon alleges that the defendants violated state and federal law by knowingly distributing its confidential engineering materials and its client list without Paragon's knowledge. (See Doc. 61 ¶ 26). Claims under the Defense of Trade Secrets Act ("DTSA") and the Pennsylvania Uniform Trade Secrets Act ("PUTSA") require the same two elements: (1) "the existence of a trade secret," and (2) "misappropriation of that secret," *i.e.*, the knowing improper acquisition, use, or disclosure of that secret without the owner's consent. See Garcia v. Vertical Screen, Inc., No. 19-CV-3184, 2020 WL 2615624, at *4 (E.D. Pa. May 22, 2020). Although the

two statutes use slightly different wording, they both define a trade secret as information that: (1) "the owner has taken reasonable means to keep secret"; (2) "derives independent economic value, actual or potential, from being kept secret"; (3) "is not readily ascertainable by proper means"; and (4) "others who cannot readily access it would obtain economic value from its disclosure or use." See Teva Pharms. USA, Inc. v. Sandhu, 291 F. Supp. 3d 659, 674-676 (E.D. Pa. 2018) (citing, *inter alia*, 18 U.S.C. § 1839; 12 Pa. Cons. Stat. § 5302).

Paragon has demonstrated a likelihood of success on these claims. Paragon's client list is clearly a trade secret. Paragon kept the list secret from competitors and most of its employees. (See 10/11/24 Hr'g Tr. 29:24-30:17). It also required employees to sign a non-compete agreement to prevent the list's disclosure. (See id. at 29:5-9). And it developed its client list based on years of assessing the need for professional engineering services in the marketplace. (See id. at 31:2-33:1). Mr. Silar misappropriated Paragon's client list by emailing it to his potential clients. (See id. at 174:23-175:15). Instead of respecting the significance of his non-compete agreement, he carelessly shared the client list with actual or potential competitors of Paragon. (See id.) He also intentionally shared the list with his codefendants, telling Ms. Thompson to "[h]ave fun with this." (See P. Ex. 53 at 1).

Mr. Silar and his codefendants acted in a similar manner regarding Paragon's technical drawings. Paragon spent hundreds of hours developing its technical drawings for telecommunications projects. (See 10/11/24 Hr'g Tr. 33:20-34:9). Mr. Beddia testified as to how a competitor's access to these documents could save them months of work and put Paragon at a competitive disadvantage. (See id.)

When HPS asked Mr. Silar for some of these materials, Mr. Silar instructed HPS to ask Paragon for them—evincing his awareness of their valuable and proprietary nature. (See id. at 157:21-158:5; see also P. Ex. 26 at 1). After Paragon refused, Mr. Silar took it upon himself to distribute the materials without Paragon's knowledge or consent. (See 10/11/24 Hr'g Tr. 158:6-160:17; P. Ex. 27 at 2).[3] Hence, Paragon has made "a showing significantly better than negligible" on its claims for misappropriation of trade secrets. See Reilly, 858 F.3d at 179 (citations omitted).

**B.    Irreparable Harm**

Paragon's initial victory is fleeting, however. Paragon is not entitled to an injunction because it has not demonstrated any ongoing irreparable harm. To receive injunctive relief, a plaintiff must show immediate, irreparable harm or a threat thereof that cannot adequately be addressed post-trial by legal or equitable remedies. See Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 799 (3d Cir. 1989); accord 22nd Century Techs., Inc. v. iLabs, Inc., No. 22-1830, 2023 WL 3409063, at *5 (3d Cir. May 12, 2023) (quoting Cont'l Grp., Inc. v. Amoco Chems. Corp., 614 F.2d 351, 359 (3d Cir. 1980) ("The harm must be 'immediate' or a 'presently existing actual threat.'")). In other words, the harm must be such that

---

[3] We note that there is some uncertainty concerning whether Paragon knowingly distributed these materials to other engineers that were working with AT&T. Ms. Friedman testified that while working at Paragon, she regularly uploaded the materials to AT&T's online storage database, which various engineering firms could access. (See Doc. 60 ¶¶ 60-63; 10/11/24 Hr'g Tr. 183:7-186:2). Mr. Beddia admitted that he never searched Ms. Friedman's email account to confirm whether this occurred and to what extent. (See 10/11/24 Hr'g Tr. 106:13-107:3). Nonetheless, there is sufficient evidence of defendants' misappropriation of trade secrets at this stage of the proceedings.

"compensation of money cannot atone for it."  See A.O. Smith Corp. v. FTC,

530 F.2d 515, 525 (3d Cir. 1975) (citation omitted).  "Furthermore, a showing of

irreparable harm is insufficient if the harm will occur only in the indefinite future.

Rather, the moving party must make a 'clear showing of immediate irreparable

harm.'"  See Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 91 (3d Cir. 1992)

(quoting Hohe v. Casey, 868 F.2d 69, 72 (3d Cir. 1989), cert. denied, 493 U.S. 848

(1989)).  "Establishing a risk of irreparable harm is not enough.  A plaintiff has the

burden of proving a 'clear showing of immediate irreparable injury.'"  See id.

(quoting ECRI v. McGraw–Hill, Inc., 809 F.2d 223, 226 (3d Cir.1987)).

There is no evidence before the court, beyond Paragon's own speculation,

that the defendants' purported misconduct is ongoing.  It is true that state and

federal courts have enjoined employees from working for a competitor when they

are "likely" to use, or there is some "threat of" their use of, their former employer's

confidential information.  See Bimbo Bakeries USA, Inc. v. Boticella, 613 F.3d 102,

110-11 (3d Cir.2010) ("Under Pennsylvania law, the proper inquiry in determining

whether to grant an injunction to prevent the threatened disclosure of trade secrets

is whether there is sufficient likelihood, or substantial threat of, a defendant

disclosing trade secrets."); see also A.M. Skier Agency, Inc. v. Gold, 747 A.2d 936,

939 (Pa. Super. Ct. 2000).  Mr. Beddia conceded that Paragon has not engaged in

any telecommunications work since Ms. Friedman left the company in 2020.  (See

10/11/24 Hr'g Tr.  94:7-16; 129:4-7).  Mr. Silar explained that the COVID-19 pandemic

killed the telecommunications industry in 2022, and that he has not engaged in that

work or used the materials at issue in this case for years.  (See Doc. 60 ¶¶ 58, 64;

19

10/11/24 Hr'g Tr. 163:17-24; see also id. at 174:4-11).  Ms. Friedman likewise

confirmed that Providence has not done telecommunications work since 2021

because it is no longer profitable.  (See 10/11/24 Hr'g Tr. 186:3-8, 190:7-14).

Mr. Beddia conceded that he has no evidence to the contrary.  (See id. at 130:18-

132:6).[4]  And his speculative fears about what the defendants "have the ability to

do," (id. at 95:13-19), does not evince a "presently existing actual threat," see Cont'l

Grp., Inc., 614 F.2d at 359 (citation omitted).  These facts are fatal to Paragon's

motion.

Mr. Beddia further conceded that Paragon has no evidence that Mr. Silar

distributed Paragon's client list since 2022.  (See id. at 130:14-17).  Mr. Silar credibly

testified that he has not distributed it to anyone since Paragon caught him sharing

it with potential clients in violation of his non-compete agreement.  (See id. at 175:9-

21).  And the Providence Defendants have been ready and willing to return or to

destroy Paragon's client list to mitigate any purported harm to Paragon.  (See id.

at 98:13-101:3).  They emailed Paragon on May 6, 2024—over a month before

Paragon moved for a preliminary injunction—to inquire "how Paragon would like

the list destroyed and assuming it is a reasonable request, we will delete the

electronic list and confirm the same to you in writing."  (See Doc. 51-1 at 3-4).  Yet

---

[4] Mr. Beddia's testimony, in certain regards, also lacked credibility.  For example, his testimony concerning Paragon's practice of sharing CAD files partially contradicted the deposition testimony of Paragon's corporate designee, Rodger Lease.  (See 10/11/24 Hr'g Tr. 115:13-118:25).  Moreover, he testified quite surprisingly that he did not know whether Bluewater paid Paragon in full for the telecommunication projects that are the subject of this very dispute.  (See id. at 123:4-25).

Paragon chose to ignore Providence's offer for five months. (See 10/11/24 Hr'g Tr. 99:5-101:3 (Mr. Beddia testifying that Providence should "[d]elete the list and not use it")). The court will not countenance Paragon's efforts to manufacture its risk of harm in this manner.

Paragon may very well succeed on one or more of its claims, but there is no continuing behavior or action that this court can remedy with preliminary injunctive relief. See First Health Group Corp. v. Nat'l Prescription Adm'rs, Inc., 155 F. Supp. 2d 194, 235-36 (M.D. Pa. July 19, 2001) ("Any irreparable harm alleged by [plaintiff] must be *prospective*.") (emphasis added). As set forth above, Paragon has failed to show that there is an extant risk of irreparable harm, and therefore it must wait to resolve its claims through a trial on the merits. See Instant Air Freight Co., 882 F.2d at 801.

## V.    **Conclusion**

We will deny Paragon's motion for preliminary injunction. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    December 9, 2024